William K. Harriman and Laretta B. Harriman v. Commissioner.
Harriman v. Commissioner
Docket No. 4553-65.
United States Tax Court
T.C. Memo 1967-190; 1967 Tax Ct. Memo LEXIS 70; 26 T.C.M. (CCH) 941; T.C.M. (RIA) 67190; October 4, 1967
William R. Frazier, 816 Atlantic Nat'l Bank Bldg., Jacksonville, Fla., for the petitioners. Vernon J. Owens, for the respondent. WITHEY
*71 Memorandum Findings of Fact and Opinion WITHEY, Judge: The Commissioner has determined a deficiency in the income tax of petitioners for the taxable year 1963 in the amount of $1,382.40. Because the parties have resolved certain issues raised by the pleadings, which resolutions will be given effect under Rule 50, the sole remaining issue to be decided is whether respondent has erred in disallowing a claimed nonbusiness bad debt deduction. Findings of Fact All stipulated facts are found accordingly. At the date of filing of the petition herein, petitioners were residing in Jacksonville, Florida, and their joint income tax return for 1963 was filed with district director of internal revenue at that city. On their return filed for 1963, petitioners claimed a short-term capital loss of $16,000, with the notation that a debt became worthless. The loss claimed on the return was used thereon to offset long-term capital gains and capital gain dividends totaling $11,206.48 with a resulting net loss of $4,793.52, of which $1,000 was used to offset ordinary income. Respondent, in the statutory notice of deficiency mailed to the petitioners on May 10, 1965, refused to recognize *72 the claimed worthless debt deduction and consequently disallowed the claimed deduction of $1,000 and considered the long-term capital gains and capital gain dividends taxable to the extent of 50 percent thereof, to wit, $5,603.24. With respect to the claimed worthless debt, petitioner William K. Harriman, between November 24, 1959, and October 3, 1961, made a series of advancements totaling $16,000 to Francis O'Keefe. O'Keefe operated a business known as "O'Keefe's Theatre Ticket Agency" with offices located at 520 Fifth Avenue, New York City, New York. Under the arrangement between Harriman and O'Keefe, the latter was to invest the amounts advanced to him by Harriman in tickets in Broadway plays and musical shows. The tickets were then to be resold through the ticket agency at inflated prices. The arrangements under which the money was advanced are embodied in certain unilateral notarized statements of O'Keefe dated November 24, 1959, January 26, 1960, March 5, 1960, December 28, 1960, April 12, 1961, April 24, 1961, June 2, 1961, and October 3, 1961. The arrangements embodied in the notarized statements of O'Keefe dated November 24, 1959, April 12, 1961, April 24, 1961, June 2, 1961, and *73 October 3, 1961, provided for a total advancement of $11,500 on which Harriman was to receive 20 percent interest every 6 months during the run of the particular musical show. At the end of the run of the particular show, Harriman's full advancement thereon was to be returned to him. If the show closed shortly after opening, Harriman was to receive the return of his full advancement plus 6 percent interest thereon in all events. The arrangements embodied in the notarized statements of O'Keefe dated January 26, 1960, March 5, 1960, and December 28, 1960, provided for a total advancement of $4,500 on which Harriman was to receive 20 percent interest every 6 months. All of the arrangements embodied in the statements of O'Keefe mentioned above provided that Harriman could withdraw his full advancement upon giving O'Keefe advance notice of 30 days. Harriman received the 20 percent interest every 6 months, as provided in the arrangements described above, until October 12, 1961, in the total amount of $3,800. As of December 31, 1963, Harriman had received no part of the principal advanced. On March 3, 1965, petitioners obtained from O'Keefe his Affidavit of Confession of Judgment *74 with respect to all amounts of principal and interest still remaining unpaid under the terms of the statements of O'Keefe above referred to. No judgment thereon has at any time been entered with respect thereto. Ultimate Finding The arrangements between petitioner and O'Keefe evidenced by the latter's statements were invalid and unenforceable under New York State law because of the percentage of interest provided therein. No valid and enforceable debt existed in 1963 between the taxpayers and O'Keefe with respect to the claimed losses herein. Opinion Our ultimate finding last above set forth makes it unnecessary to determine whether the nonbusiness "debt" claimed as a loss in petitioners' return for 1963 became worthless in that year. Petitioners' position is based almost entirely upon their contention that under New York State case-law the arrangements with O'Keefe, set forth in our findings, constituted valid and subsisting debts owing by him in 1963 within the meaning of section 166(a)(1) and (d)(1)(A) and (B), Internal Revenue Code of 1954. [1] In so contending they argue the respondent's regulation, section 1.166-1(a) and (c), Income Tax Regs., [2] in requiring a debt *75 to be enforceable in order to qualify as a loss upon its becoming worthless, is in effect invalid as beyond the scope of section 166 which provides that "any debt" which becomes worthless is deductible as a loss. The parties agree that New York State law is controlling on the question. *76 Our examination of New York statutes and case-law does not disclose any support for petitioners' position. New York General Business Law, section 370, establishes the rate of interest upon loans at 6 percent. Section 371 thereof directly prohibits the taking of greater interest either in money or any other form. Section 373 thereof, as amended April 28, 1960, renders any instrument - Whereupon or whereby there shall be reserved or taken, or secured or agreed to be reserved or taken, any greater sum, or greater value, for the loan or forebearance of any money, * * * than is above prescribed, * * * void ab initio. The section further provides a mandatory requirement that - Whenever it shall satisfactorily appear by the admissions of the defendant, or by proof, that any * * * security or any evidence of debt, has been taken or received * * * calling for greater interest than 6 percent - the court shall declare the same to be void, and enjoin any prosecution thereon, and order the same to be surrendered and canceled. The above provisions of State law clearly render the evidences of the arrangement with O'Keefe void in their inception and unenforceable. However, petitioners *77 further argue that, even though by State statute the evidences of debt here involved may be usurious and void, the defense of usury is personal, must be pleaded and may be waived by the borrower. Petitioner cites New York authority for the above position and concludes therefrom that, in effect, the instant evidences of debt are merely voidable, but not void ab initio. We think that, if true, mere voidability of the evidences of this debt does not qualify the debt claimed here as a loss on its becoming worthless under section 166. The fact still remains that whether these evidences of debt are void ab initio or merely voidable is wholly within the control of the borrower who may render them one or the other simply by pleading usury as a defense and making a showing that any action to recover the "debt" is based upon these usurious instruments or by failing to make such a plea. Petitioners' "debt" was clearly unenforceable within the meaning of respondent's regulation. Although under conceivable circumstances a debtor-creditor relationship may have existed between these parties, it was not "based upon * * * [an] enforceable obligation to pay" as required by that regulation and therefore *78 does not give rise to a deductible debt under section 166 of the Code. As for petitioner's argument that respondent's regulation is invalid as going beyond the scope of section 166, a brief look at the history of the bad debt deduction will show this argument to be without merit. Petitioner's position is that the use of the word "any" in section 166(a)(1) indicated a congressional intent that all debts whether enforceable or not could give rise to a bad debt deduction. [3] However, the key word in the section is not "any" but "debt." As early as 1930 the Board of Tax Appeals stated that the word "debt" as used in the statutory provision for bad debts (there section 214(7) of the Revenue Act of 1921, 42 Stat. 227, one of the earlier statutory provisions dealing with bad debts), was to be taken in its usual and accepted meaning, and then went on to define "debt" as "a specific sum of money, which is due and owing from one person to another, and denotes not only the obligation of the debtor to pay, but the right of the creditor to receive and enforce payment." [Emphasis added.] J. S. Cullinan, 19 B.T.A. 930 (1930). Thus, in respondent's regulations, section 1.166-1(c), Income Tax Regulations *79 , the requirement that there be an enforceable obligation is merely a reiteration of long established law and not a requirement beyond the scope of the statutory section. In fact, this Court itself has previously sustained the regulation in question as a "reasonable interpretation of the law," Wilkins Pontiac, 34 T.C. 1065 (1960), affd, on this ground but reversed on another, 298 F. 2d 893 (C.A. 9, 1961).
Petitioners argue further that the advancements by Harriman to O'Keefe were investments and cites New York authority for the proposition that the usury laws of that state therefore do not apply. We find that this contention is also without merit. It is true that O'Keefe's unilateral statements label the advancements as investments, but the essence *80 of these statements is that they are nothing more than demand promissory notes constituting promises to repay loans. There is no subjection of the moneys advanced to the risk of O'Keefe's or any other business which would substantiate their characterization as investments. In fact there is no risk to be taken by petitioners at all except that which usually is inherent in a loan, i.e., that the borrower is unable or will not return the advanced moneys. Cf. Vee Bee Service Co. v. Household Finance Corp., 51 N.Y.S. 2d 590, 600 (Sup. Ct. 1944), affd. 269 App. Div. 772, 55 N.Y.S. 2d 570 (1945). Respondent's treatment of the nonbusiness bad debt claim of petitioners is sustained. Decision will be entered under Rule 50. Footnotes
1. SEC. 166. Bad Debts. (a) General Rule. - (1) Wholly Worthless Debts. - There shall be allowed as a deduction any debt which becomes worthless within the taxable year. * * *
(d) Nonbusiness Debts. - (1) General Rule. - In the case of a taxpayer other than a corporation - (A) subsections (a) and (c) shall not apply to any nonbusiness debt; and (B) where any nonbusiness debt becomes worthless within the taxable year, the loss resulting therefrom shall be considered a loss from the sale or exchange during the taxable year, of a capital asset held for not more than 6 months. ↩
2. SEC. 1.166-1. Bad Debts. (a) Allowance of deduction. Section 166 provides that, in computing taxable income under section 63, a deduction shall be allowed in respect of bad debts owed to the taxpayer. * * *
(c) Bona fide debt required. Only a bona fide debt qualifies for purposes of section 166↩. A bona fide debt is a debt which arises from a debtor-creditor relationship based upon a valid and enforceable obligation to pay a fixed or determinable sum of money. * * *
3. Section 23(k)(1) of the Internal Revenue Code of 1939 contained the language "Debts which become worthless." In the 1954 Code the language changed to "any debt which becomes worthless." However, the House Ways and Means Committee Report (H. Rept. No. 1337, to accompany H.R. 8300 (Pub. L. 591), 83d Cong., 2d Sess., p. A 47 (1954)) stated that in enacting section 166(a)(1)↩ "No substantive change is made."